1  J. DAVID HADDEN (CSB No. 176148)
   dhadden@fenwick.com
2  HECTOR J. RIBERA (CSB No. 221511)
   hribera@fenwick.com
3  MICHAEL C. SAUNDERS (CSB No. 270414)
   msaunders@fenwick.com
4  FENWICK & WEST LLP
   Silicon Valley Center
5  801 California Street
   Mountain View, CA  94041
6  Telephone:     (650) 988-8500
   Facsimile:     (650) 938-5200
7
   Attorneys for Defendant
8  VOXERNET, LLC

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11 IPVX PATENT HOLDINGS, INC., a          Case No. C 13-cv-01708 HRL
   Delaware
12 Corporation,                           **DEFENDANT VOXERNET LLC'S**
                                          **NOTICE OF MOTION AND MOTION**
13              Plaintiff-Counterdefendant, **TO REQUIRE PLAINTIFF IPVX TO**
                                          **POST AN UNDERTAKING AND**
14      v.                                **SUPPORTING MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES**
15 VOXERNET, LLC, a Delaware
   limited liability company,             Hearing Date:  January 14, 2014
16                                        Hearing Time: 10:00 a.m.
                Defendant-Counterclaimant Courtroom 2 – 5th Floor
17                                        Judge: Hon.  Howard R. Lloyd
                                          Date Action Filed:  March 20, 2012
18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES...................................................2

I.    INTRODUCTION........................................................................................ 2

II.   STATEMENT OF THE ISSUE TO BE DECIDED ..................................6

III.  LITIGATION HISTORY AND STATEMENT OF FACTS ....................6

IV.  THE COURT SHOULD REQUIRE IPVX TO POST AN UNDERTAKING .............8

     A.    Plaintiff Is an Out-of-State Corporation................................................10

     B.    There Is a Reasonable Possibility That VoxerNet Will Obtain Judgment in Its Favor..............................................................10

          1.    VoxerNet's Voxer Product and Service Does Not Use a Telephone System ......................................................11

               a.    VoxerNet's Voxer System.....................................11

               b.    The Claims of the '576 Patent Require a Telephone System ....12

     C.    VoxerNet Can Expect to Incur at Least $749,000 in Recoverable Costs and Fees ...........................................................16

          1.    Reasonable Hourly Rate ............................................................17

          2.    Hours Reasonably Expected ......................................................18

V.    CONCLUSION..........................................................................................19

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AF Holdings, LLC v. Magsumbol*,
   No. 12-4221 SC, 2013 WL 1120771 (N.D. Cal. Mar. 18, 2013)................................ 9

*AF Holdings, LLC v. Trinh*,
   No. 12-2393-CRB, 2012 U.S. Dist. LEXIS 161394 (N.D. Cal. Nov. 9, 2012) ...................... 9

*Brooks Furniture Mfg. v. Dutailier Intern., Inc.*,
   393 F.3d 1378 (Fed. Cir. 2005)...................................................... 8

*Eaton Corp. v. Rockwell Int'l Corp.*,
   323 F.3d 1332 (Fed.Cir.2003)....................................................... 15

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
   No. 3:08-cv-01992, 2010 WL 3718848 (S.D. Cal. Sept. 20, 2010)................... 9, 10, 17

*HPL Technologies, Inc. Securities Litigation*,
   366 F.Supp.2d 912 (N.D. Cal. 2005) ........................................... 17, 18

*In re Merrill Lynch Relocation Mgmt., Inc.*,
   812 F.2d 1116 (9th Cir. 1987)...................................................... 8

*Jodan v. Multnomah County*,
   815 F.2d 1258, 1262 (9th Cir. 1987)................................................ 17

*Klausner Techs., Inc. v. Vonage Holdings Corp.*,
   No. 2 06-CV-275, 2007 WL 2300789 (E.D. Tex. Aug. 7, 2007) ................. 14, 15, 16

*Kourtis v. Cameron*,
   358 Fed. Appx. 863 (9th Cir. 2009) ................................................ 9

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
   182 F.3d 1298 (Fed.Cir.1999)................................................... 14, 15

*Recouvreur v. Carreon*,
   --- F.Supp.2d.---, 2013 WL 1719199 (N.D. Cal. Apr. 12, 2013)...................... 17

*Simulnet E. Assocs. v. Ramada Hotel Operating Co.*,
   37 F.3d 573 (9th Cir. 1994)....................................................... 8, 9

**STATUTES**

35 U.S.C.
   § 285....................................................................... 5, 6, 8

CAL. CIV. PROC. CODE
   § 1030.................................................................... *passim*

**OTHER AUTHORITIES**

Fed. R. Civ. P. 11 ......................................................... 5, 8, 17

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## NOTICE OF MOTION AND MOTION

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3      **PLEASE TAKE NOTICE** that on Tuesday, January 14, 2014, at 10:00 a.m. defendant

4   VoxerNet, LLC ("VoxerNet"), by and through undersigned counsel and pursuant to federal law

5   and  California Code of Civil Procedure § 1030, shall appear before the Honorable Judge Howard

6   R. Lloyd at the San Jose Courthouse, Courtroom 2 – 5th Floor, located at 280 South 1st Street, San

7   Jose, CA 95113, and will present its motion to require plaintiff IPVX Patent Holdings, Inc.

8   ("IPVX") to post an undertaking pursuant to Cal. Code Civ. Proc. § 1030.[1]

9      VoxerNet relies on this motion, the attached memorandum in support, all supporting

10  declarations filed herewith, including the declarations of the defendant and defendant's counsel,

11  and any oral arguments made before the Court.  For the reasons set out more fully herein,

12  defendant VoxerNet requests that this court require plaintiff IPVX to post an undertaking in the

13  amount of $749,000 to cover costs and fees that VoxerNet expects to incur in this action.

14

15

16  Dated:    November 22, 2013                    Respectfully Submitted,

17                                                  /s/ Hector J. Ribera
                                                    Hector J. Ribera
18                                                  Fenwick & West, LLP

19                                                  Attorneys for Defendant
                                                    VOXERNET, LLC

20

21

22

23

24  [1] Pursuant to the Court's standing order, counsel for VoxerNet emailed counsel for IPVX on
    Thursday, November 21, 2013 at 4:07 p.m. PST requesting confirmation that hearing this motion
25  on January 7, 2014 would not cause IPVX undue prejudice.  Lead counsel for IPVX, Pierre
    Yanney, responded at 10:53 p.m. that his religious Christmas celebration takes place on January 7
26  and that he could not attend a hearing on that date.  VoxerNet's counsel responded roughly fifteen
    minutes later inquiring whether hearing the motion on January 14, 2014 instead would cause
27  IPVX undue prejudice.  VoxerNet's counsel also left a follow-up voicemail at 2:47 p.m. the
    following afternoon.  As of the time of this filing, VoxerNet's counsel has not received a reply
28  from IPVX.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

This case is the latest in a long series of patent infringement actions brought by IPVX and its predecessor, "Klausner Technologies, Inc." ("Klausner Technologies"). IPVX is merely a corporate shell (as was Klausner Technologies) apparently established solely for the purpose of bringing lawsuits asserting infringement of U.S. Patent No. 5,572,576 (the "'576 patent"). IPVX has never made any products, but rather exists only to extract licensing fees through settlements of litigation. As of July 19, 2012, IPVX was simultaneously litigating forty-four patent cases involving the '576 patent. (Dkt. No. 19, IPVX's Opposition to VoxerNet's Motion to Transfer, at 6.) As of October 22, 2013, twenty-one of these cases remained, including VoxerNet's. (Dkt. No. 60-3, Ex. C to Second Amended Joint Case Management Statement.)

IPVX was formed on May 12, 2012 in the midst of Klausner Technologies' litigation campaign. IPVX has disclosed little about the reason for its creation or existence or why it replaced Klausner in the litigation. It has purportedly been "assigned all right, title and interest in" the '576 patent and purports to be "a completely separate entity" from its predecessor, Klausner Technologies. (Dkt. No. 11, Klausner Technologies' Motion to Substitute Parties, at 1.) Gary Lieb is the only person identified in IPVX's initial disclosures as having knowledge of IPVX's activities, and his affiliation is vaguely described as a "representative." (*See* Declaration of Michael Saunders ("Saunders Decl.") ¶ 21, Ex. N, IPVX's Initial Disclosures, at 3.) And IPVX has refused to produce any documents relating to its financial health or resources that would show its ability to pay for VoxerNet's litigation costs and attorneys' fees should it prevail. (Saunders Decl. ¶ 22, Ex. O, Excerpts from IPVX's Responses to VoxerNet's First Set of Requests for Production, at 38.) As a result, VoxerNet has legitimate concerns that IPVX may vanish from existence as quickly as it appeared and leave VoxerNet without recourse to recover its fees and costs.

The '576 patent is titled "Telephone Answering Device Linking Displayed Data with Recorded Audio Message." (*See* Saunders Decl. ¶ 11, Ex. A, '576 Patent, at face.) The '576 patent expired on March 31, 2012, eleven days after IPVX filed its complaint against VoxerNet.

Each of the asserted claims are directed to "[a] method of automatically answering incoming telephone calls and storing and retrieving information from the incoming telephone calls with a telephone answering device," said "telephone answering device having a memory and being coupled to a telephone[.]"  (Saunders Decl. ¶ 11, Ex. A, '576 Patent, at claims 3, 4, 18, 19; Ex. B, IPVX's Local Patent Rule 3-1 Disclosures, at 2 (identifying claims 3, 4, 18 and 19 as the "Asserted Claims."))  The inventors, Judah Klausner and Robert Hotto, never built a working prototype of their "invention."  (Saunders Decl. ¶ 13, Ex. C, IPVX's Response to VoxerNet's First Set of Interrogatories, at 13-15.)  Instead they "constructively reduced [the invention] to practice" by filing the parent patent applications to the '576 patent.  (*Id.*)  No efforts were made by them to transfer this technology into a commercially viable product.  (*Id.*)

As one might expect based on a plain reading of the asserted claims, as mentioned above, an infringer would need to "automatically answer[ ] telephone calls" and operate a "telephone answering device . . . coupled to a telephone."  Yet VoxerNet's accused product does not "answer" any telephone calls, as VoxerNet has repeatedly pointed out to IPVX.  (Declaration of James T. Panttaja in Support of VoxerNet's Motion to Require IPVX to Post an Undertaking ("Panttaja Decl.") ¶¶ 3-5.)  Indeed, VoxerNet's accused product and service, the Voxer Walkie Talkie software application (or "app"), makes no use of any telephone system, including conventional telephone systems, cellular telephone systems, or Voice over Internet Protocols ("VoIP").  (*Id.*)  IPVX therefore has no basis for contending that VoxerNet's product actually meets these "telephone" limitations and can only point to the doctrine of equivalents allegations—essentially admitting that VoxerNet's product does not literally infringe.  (Saunders Decl. ¶ 12, Ex. B, IPVX's Patent Local Rule 3-1 Disclosures, Appendix A at 4-5, 23-24.)[2]

---

[2] IPVX also has little claim to damages.  For the time period between the launch of VoxerNet's Voxer Walkie Talkie app until the expiration of '576 patent on March 31, 2012, VoxerNet provided its Voxer app to users as a free download from the Apple App Store and the Android Marketplace.  (Panttaja Decl., at ¶ 2.)  Further, because the asserted claims require actions on both the client and server side, IPVX is likely limited to a theory of indirect infringement, which would require IPVX to prove that VoxerNet had both pre-suit knowledge of the patent and its infringement by VoxerNet's users.  IPVX is unlikely to show that VoxerNet had pre-suit knowledge that its product was "automatically answer[ing] telephone calls."  IPVX's damages will therefore be, at best, limited to the eleven days between filing suit on March 20, 2012 and the expiration of the patent on March 31, 2012.  It is unlikely IPVX is expecting a large recovery based on these eleven days of alleged indirect infringement by a free software app.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Indeed, IPVX's infringement theory against VoxerNet is so weak that VoxerNet can only conclude that IPVX has no real intention of ultimately prevailing on the merits. IPVX's apparent strategy therefore is not to win, but to engage in harassing and burdensome litigation tactics so that it can pressure VoxerNet into a settlement. For instance, IPVX originally filed suit in an inconvenient forum for VoxerNet and then, without basis, opposed VoxerNet's motion to have its case transferred to the Northern District of California, driving up the costs of litigation for VoxerNet in the process. IPVX also recently forced VoxerNet to respond to 169 requests for production of documents, a large portion of which were either boilerplate, seemingly copied and pasted from IPVX's cases against other unrelated companies, or had absolutely no relevance to VoxerNet's product and service. And in general IPVX has continued to pursue its claims against VoxerNet for nearly two years, despite the clear weaknesses in its infringement case.

In these regards, IPVX is behaving like a quintessential patent "troll" that even the White House has condemned. (*See* Saunders Decl. ¶ 14, Ex. D, White House Report, at 2.) Indeed, IPVX's apparent approach to this litigation is neatly summed up by the seven features typical of the "patent assertion entity" business model, as described in a June 2013 report prepared by the U.S. President's Council of Economic Advisors, the National Economic Council, and the Office of Science & Technology Policy:

1. They do not "practice" their patents; that is, they do not do research or develop any technology or products related to their patents;

2. They do not help with "technology transfer" (the process of translating the patent language into a usable product or process);

3. They often wait until after industry participants have made irreversible investments before asserting their claims;

4. They acquire patents solely for the purpose of extracting payments from alleged infringers;

5. Their strategies for litigation take advantage of their non-practicing status, which makes them invulnerable to counter-claims of patent infringement;

6. They acquire patents whose claim boundaries are unclear, and then (with little specific evidence of infringement) ask many companies at once for moderate license fees, assuming that some will settle instead of risking a costly and uncertain trial;

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7. They may hide their identity by creating numerous shell companies and requiring those who settle to sign non-disclosure agreements, making it difficult for defendants to form common defensive strategies (for example, by sharing legal fees rather than settling individually.)

(Saunders Decl. ¶ 14, Ex. D, White House Report, at 4.)

As President Obama recognized earlier this year, such PAEs "don't actually produce anything themselves," but rather "are just trying to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them." (*Id.* at 2 (quoting remarks made by President Obama on February 14, 2013).) The problem, as Judge Rader, Colleen Chien, and David Hricik recently explained in an editorial published in the New York Times,

stems largely from the fact that, in our judicial system, trolls have an important strategic advantage over their adversaries: they don't make anything. So in a patent lawsuit, they have far fewer documents to produce, fewer witnesses and a much smaller legal bill than a company that does make and sell something. . . . Trolls, moreover, use lawyers to represent them on a contingent-fee basis (lawyers get paid only when they win), allowing trolls to defer significant legal costs that manufacturers, who generally must pay high hourly fees, cannot. . . . With huge advantages in risk and cost, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees. Defendants, on the other hand, have much more to lose from a protracted legal fight and so they end up settling.

(Saunders Decl. ¶ 15, Ex. E, June 4, 2013 NY Times Editorial at 1-2.)

But Judge Rader and the other authors offer a solution, which motivates VoxerNet to bring this motion. They note: "Lost in the debate, however, is that judges already have the authority to curtail these practices: they can make trolls pay for abusive litigation." (*Id.* at 2.) "In particular, Section 285 of the Patent Act, as well as Rule 11 of the Federal Rules of Civil Procedure, give judges the authority they need to shift the cost burden of litigation abuse from the defendant to the troll. . . . And even though many cases settle, the prospect of paying fees will discourage aggressive suits and frivolous demands." (*Id.*)

VoxerNet would add that California Code of Civil Procedure § 1030 provides a mechanism for judges to curtail abusive litigation practices at an even earlier stage of litigation. Courts in this District have the authority under § 1030 to require PAEs to post security in the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

amount of defendants' anticipated costs and fees in order to ensure that defendants are fairly compensated when frivolous lawsuits are filed against them.  Using such authority, courts can effectively require PAEs to either stand behind their infringement contentions or abandon cases they know to be frivolous.  Use of § 1030 in this context is also consistent with recently proposed legislation in the U.S. Senate which would permit courts to order PAEs to post a bond sufficient to cover its opponent's fees and costs at the beginning of the case.  (*See* Saunders Decl. ¶ 19, Ex. L, Patent Litigation Integrity Act, S. 1612 (amending patent code to insert 35 U.S.C. § 285A, which would provide that "[t]he court, on motion by the defendant or a respondent in a proceeding, may order the party alleging infringement to post a bond sufficient to ensure payment of the accused infringer's reasonable fees and other expenses, including attorneys' fees").)  Under California law, the judges of this District already have the power that this new proposed law will expand to a nationwide scope.

Accordingly, because VoxerNet is unfairly shouldering the burden of paying for IPVX's frivolous infringement case, and because IPVX is a shell company organized only for the purpose of pursuing patent infringement litigation, VoxerNet brings the instant motion to preserve its ability to recover its litigation expenses after defeating IPVX.

## II.      STATEMENT OF THE ISSUE TO BE DECIDED

Whether plaintiff IPVX Patent Holdings, Inc. ("IPVX") should be required to post an undertaking in the amount of $749,000 to cover costs and fees that defendant VoxerNet, LLC ("VoxerNet") expects to incur in this action.

## III.     LITIGATION HISTORY AND STATEMENT OF FACTS

VoxerNet has been burdened with significant costs and fees deriving from motion practice and discovery that would have been unnecessary if not for IPVX's stubborn refusal to abandon its frivolous infringement claims.  Klausner Technologies filed the instant complaint against VoxerNet nearly two years ago on March 20, 2012 in the United States District Court for the Eastern District of Texas.  (Dkt. No. 1, Complaint.)  On May 22, 2012, Klausner Technologies vanished and filed a motion to substitute a new ephemeral entity, IPVX, as the named plaintiff in this action.  (Dkt. No. 12, Order Granting Motion to Substitute Party.)

Fenwick & West LLP
Attorneys at Law
San Francisco

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Because the parties had no ties to the Eastern District of Texas besides IPVX's preference

2    for litigating its patent in that inconvenient forum, VoxerNet was forced to file a motion to

3    transfer.  (Dkt. No. 16, VoxerNet's Motion to Change Venue.)  Without any ties, evidence, or

4    witnesses in the Eastern District of Texas, IPVX still opposed VoxerNet's motion and forced this

5    case to languish in Texas.  (Dkt. No. 19, IPVX's Opposition to VoxerNet's Motion to Change

6    Venue.)   During that time VoxerNet's case was consolidated with a number of co-pending

7    actions brought by IPVX.  (*See* Dkt. Nos. 29 (Status Conference and Consolidation Order), 30

8    (Severance and Reconsolidation Order).)  After more than a year of litigation, the Eastern District

9    Court granted VoxerNet's motion and the case was transferred to the Northern District of

10   California. (Dkt. No. 35, Order Granting Motion to Change Venue.)

11   Since the transfer, IPVX has continued to press its case in this District.  In particular,

12   VoxerNet was recently forced to accumulate significant legal fees drafting and responding to

13   overbroad and harassing discovery.  On August 26, 2013, VoxerNet served its first set of requests

14   for production and interrogatories on IPVX, and IPVX responded on September 30, 2013.

15   (Saunders Decl. ¶¶ 13 and 22, Exs. C (IPVX's Responses to VoxerNet's First Set of

16   Interrogatories) and O (IPVX's Response to VoxerNet's First Set of RFPs).  On October 7, 2013,

17   IPVX served its first set of requests for production of documents and interrogatories on

18   VoxerNet, which included a small number of interrogatories but an extremely burdensome,

19   repetitive, and voluminous 169 requests for production.  (*Id.*)[3]  VoxerNet served its responses to

20   IPVX's discovery requests on November 12, 2013.

21   As described more fully below, VoxerNet expects to incur significant additional costs and

22   _____

[3] IPVX's first set of requests for production included a large number of requests which either had
23   no relation to the instant case or were clearly either boilerplate or copied and pasted from other
     cases.   (*See generally* Saunders Decl. ¶ 18, Ex. H, IPVX's First Set of RFPs to VoxerNet.)  For
24   instance, dozens of requests were seeking details on how VoxerNet's product answers and
     processes telephone calls (which it clearly does not do), and many other were seeking information
25   on unit pricing, customers, sales, and even packaging information when IPVX is well aware that
     the accused Voxer app is only software and during the relevant period was available as a free
26   download.  Worse yet, IPVX's request number 125 sought documents relating to changes
     VoxerNet has made to the "manner by which [it] . . . produce[s] or edit[s] motion pictures."  (*Id.*
27   at 14.)  Similarly, IPVX's request number 41 sought documents relating to trademark rights
     VoxerNet acquired.  (*Id.* at 7.)  It should have been obvious to IPVX that VoxerNet does not
28   produce and edit motion pictures, and that trademark rights are not at issue here, yet this did not
     stop it from forcing VoxerNet to respond to these irrelevant requests.

1   fees if required to litigate this case through summary judgment.  The Court held an initial case

2   management conference on October 29, 2013 and soon thereafter entered a case management

3   order setting deadlines for discovery and motion practice through claim construction and

4   summary judgment in July of 2014.  (*See* Dkt. Nos. 62 (Civil Minute Order), 63 (Case

5   Management Order).)  Unless VoxerNet is able to shift some of the fees and costs required for the

6   costs of its defense, IPVX will continue to have the upper hand in attempting to extract a

7   settlement from VoxerNet despite wielding an objectively frivolous infringement position.

8   **IV.    THE COURT SHOULD REQUIRE IPVX TO POST AN UNDERTAKING**

9          The Court should require IPVX to post an undertaking to cover VoxerNet's attorneys'

10  fees and costs of defending this litigation because based on a plain reading of the asserted claims,

11  an infringer of the '576 patent would need to "automatically answer[ ] incoming telephone calls"

12  and operate a "telephone answering device . . . coupled to a telephone."  VoxerNet's Walkie

13  Takie software app and service plainly does not come even close to doing that.

14         The "[f]ederal courts have inherent authority to require plaintiffs to post security for

15  costs."  *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1121 (9th Cir. 1987); *see also*

16  *Simulnet E. Assocs. v. Ramada Hotel Operating Co.,* 37 F.3d 573, 574 (9th Cir. 1994).  District

17  courts typically "follow the forum state's practice with regard to security for costs, as they did

18  prior to the federal rules; this is especially common when a non-resident party is involved."

19  *Simulnet*, 37 F.3d at 574.

20         Federal courts also have authority under Rule 11 and the Patent Act to require plaintiffs to

21  cover defendants' attorneys fees where a patent infringement action is vexatious, unjustified and

22  brought in bad faith.  *See* 35 U.S.C. § 285 (providing that "[t]he court in exceptional cases may

23  award reasonable attorney fees to the prevailing party"); *see also Brooks Furniture Mfg. v.*

24  *Dutailier Intern., Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (noting that a "case may be deemed

25  exceptional [under the Patent Act] when there has been some material inappropriate conduct

26  related to the matter in litigation, such as . . . misconduct during litigation, vexatious or

27  unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions.").

28         In California, the forum state's practice regarding security for out-of-state plaintiffs is

Fenwick & West LLP
Attorneys at Law
San Francisco

contained in California Code of Civil Procedure § 1030.  CCP § 1030(a) provides: "When the

plaintiff in an action or special proceeding resides out of state, or is a foreign corporation, the

defendant may at any time apply. . . for an order requiring the plaintiff to file an undertaking to

secure an award of costs and attorney's fees . . . ."  A defendant shall have grounds for an order

requiring security "**[if] there is a reasonable possibility** that the moving defendant will obtain

judgment in the action . . . ." Cal. Code Civ. Proc. § 1030(b) (emphasis added).  Federal courts

have wide discretion to grant a motion for bond, and generally balance a number of additional

factors when considering such motions, including (i) the degree of probability/ improbability of

success on the merits, and background and purpose of the suit; (ii) the reasonable security to be

posted, if any, viewed from defendant's perspective; and (iii) the reasonable extent of the security

to be posted, if any, viewed from the non-domiciliary plaintiff's perspective.  *Gabriel Techs.*

*Corp. v. Qualcomm Inc.*, No. 3:08-cv-01992, 2010 WL 3718848, at *2 (S.D. Cal. Sept. 20, 2010)

(quoting *Simulent*, 37 F.3d at 576) (internal quotes omitted).

   The Ninth Circuit has recognized the appropriateness of requiring a bond securing costs

and attorney fees in *Kourtis v. Cameron*, 358 Fed. Appx. 863 (9th Cir. 2009) (unpublished).  In

*Kourtis*, the Ninth Circuit affirmed the district court's imposition of a bond covering expected

costs and attorney's fees pursuant to the standard set forth in § 1030.  *See Kourtis*, 358 Fed.

Appx. at 866, 868.  The Northern District of California has likewise recognized the

appropriateness of requiring security for attorney's fees and costs.  *See, e.g.*, *AF Holdings, LLC v.*

*Magsumbol*, No. 12-4221 SC, 2013 WL 1120771, at *1 (N.D. Cal. Mar. 18, 2013) (requiring

bond covering defendant's expected costs and attorney fees pursuant to § 1030); *AF Holdings,*

*LLC v. Trinh*, No. 12-2393-CRB, 2012 U.S. Dist. LEXIS 161394, at *6 (N.D. Cal. Nov. 9, 2012)

(same).  Similarly, in *Gabriel Technologies*, the Southern District of California required plaintiff

to post a bond in the amount of $1,291,580, which included $1 million for attorneys' fees and

$291,580 in costs.  *See Gabriel Tech. Corp.*, No. 3:08-cv-01992, 2010 WL 3718848, at *14

(requiring attorneys' fees because "[d]efendants have presented significant, unrebutted evidence

that [p]laintiffs' lawsuit is likely unmeritorious, and brought in bad faith").

   As described more fully below, in this case the legal standard for imposition of an

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

undertaking to cover VoxerNet's legal costs and fees is met.  IPVX is an out-of-state corporation, and VoxerNet has a reasonable (or far better) possibility of obtaining judgment in this action because IPVX's infringement theory is frivolous.

### A. Plaintiff Is an Out-of-State Corporation

To establish entitlement to security under California Code of Civil Procedure § 1030, a defendant must first establish that the plaintiff resides out of state or is a foreign corporation. Cal. Code Civ. Proc. § 1030(b).  Here, IPVX does not reside in California, and it is undeniably an out-of-state corporation as it is incorporated in Delaware and has no record of being qualified to do business in California.  (*See* Saunders Decl. ¶¶ 16 and 17, Exs. F, IPVX Delaware Corporate Database Entry) and G, IPVX Patent Holdings California Secretary of State search.)  As such, the first prong in the § 1030 test is met.  *See Gabriel Tech.*, 2010 WL 3718848, at *3 (holding the first requirement of section 1030 is satisfied where plaintiff was a Delaware corporation with its principal place of business in Nebraska).

By comparison, VoxerNet is a wholly-owned subsidiary of Voxer, Inc. ("Voxer") and is operated by the employees of Voxer.  (*See* Dkt. No. 15-1, Declaration of James Panttaja in Support of VoxerNet's Motion to Transfer ¶ 2.)  VoxerNet has no employees of its own.  (*Id.*)  Voxer is a San Francisco-based private start-up company founded in 2007 which has approximately 40 employees. (*Id.* ¶ 3.)  Voxer's employees work on VoxerNet's product and service, which is also called "Voxer." (*Id.*)  The VoxerNet product was conceived, developed and designed at Voxer's San Francisco headquarters.  (*Id.* ¶ 5.)  All of Voxer's executives and employees regularly work out of Voxer's San Francisco office and most live in Northern California.  (*Id.* ¶ 6.)

### B. There Is a Reasonable Possibility That VoxerNet Will Obtain Judgment in Its Favor

To establish entitlement to security under Code Civ. Proc. § 1030, a defendant must also establish that "there is a reasonable possibility that [it] will obtain judgment in the action." Cal. Code Civ. Proc. § 1030(b).  As explained below, IPVX has no basis for alleging that VoxerNet's accused Voxer product and system "automatically answer[s] incoming telephone calls" and then

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    "stor[es] and retriev[es] information from the incoming telephone calls with a telephone

2    answering device . . . coupled to a telephone."  VoxerNet thus has a reasonable possibility of

3    obtaining judgment that its Voxer product does not infringe the asserted claims in this action.

4              **1.      VoxerNet's Voxer Product and Service Does Not Use a Telephone
                         System**

5

6              **a.      VoxerNet's Voxer System**

7             Prior to the expiration of the '576 patent on March 31, 2012, VoxerNet's sole Voxer

8    product was a push-to-talk walkie talkie software app that was available for free download from

9    the Apple App Store and the Android Marketplace by users of mobile electronic devices, such as

10   cellular smartphones and tablet computers.[4]  (Panttaja Decl. ¶ 2.)

11            The Voxer app let its registered users send audio, text and photo messages to other

12   registered users and operated over either a local Wi-Fi network or a data network offered by a

13   wireless carrier.  (*Id.* ¶ 3.)  The Voxer app thus did not depend on any telephone capabilities of a

14   user's mobile device, and would operate on tablet computers, such as Apple's iPads, and devices

15   that do not have any telephone capabilities, such as Apple's iPod Touch devices, as well as on

16   cellular smartphones that had disabled their cellular telephone connection.  (*Id.*)  This clearly

17   shows that the Voxer app does not rely on or use any telephone calls or capabilities.  The app

18   instead relied on data messages using the TCP/IP transmission protocol and therefore did not

19   make use of a conventional telephone system, a cellular telephone system or Voice-over-Internet-

20   Protocol ("VoIP") technology.  (*Id.*)

21            The Voxer app was a digital version of a "walkie talkie" radio.  When a user opened the

22   Voxer app on their mobile device, they had the option of participating in a "conversation" with

23   another Voxer user.  (*Id.* ¶ 4.)  In this "conversation," users could exchange voice messages,

24   photos and text messages asynchronously.  (*Id.*)  All incoming and outgoing messages would then

25   be stored and threaded together on the mobile device.  A Voxer user could have multiple

26   "conversations" on-going and switch between them; however, all "conversations" in the Voxer

27   _____

     [4] More recently, VoxerNet has introduced a "business" version of its product and offers enhanced
     features for a fee.  These new products and features are not relevant since they were introduced
28   well after the '576 patent expired.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

app were asynchronous.  (*Id*.)  Unlike a phone call, with the Voxer app no connection between the users was required to start or continue a "conversation."  (*Id*. ¶ 5.)

Within the Voxer system, each voice message included a message header and a message body.  (*Id*. ¶ 6.)  The message header defined a unique identifier for each participant of the conversation and would be immediately transmitted to the Voxer server if a data connection was available.  (*Id*.)  As the user spoke into the microphone, the recorded media would then be dynamically added to the body of the message and progressively streamed to the server.  (*Id*.)  At the server, a lookup would be performed using the unique identifier in the header to obtain the current IP address for each recipient. (*Id*.)   If a recipient was on-line at that time, the message would be progressively routed to the recipient as the delivery path was discovered.  (*Id*.)  If a recipient was offline, then the message would remain stored on the server and at some later time be routed to the recipient out of storage when the recipient reconnected to the network.  (*Id*.)  In addition, rendering options allowed the recipient to render the incoming message either in near real-time as the message was received over the network or in a time-shifted mode by retrieving and rendering the message out of storage.  (*Id*.)   Alternatively, received messages could be reviewed at any time, regardless if the recipient is connected to the network or not.  (*Id*.)

The progressive and store and forward attributes of Voxer provided a number of significant benefits and advantages.  (*Id*. ¶ 7.)   Unlike other asynchronous messaging systems, such as email, the progressive nature of Voxer supported near real-time communication.  (*Id*.)  With the storage of all messages on the network servers and both transmitting and receiving devices, limited communication could still take place, even if a user became disconnected from the network.  (*Id*.)   For instance, users could create messages when they became disconnected from the network and the created messages would then be automatically and seamlessly transmitted over the network to the intended recipient(s) when the user reconnected and the message could be transmitted out of the device.  (*Id*.)

### b.      The Claims of the '576 Patent Require a Telephone System

VoxerNet has more than a reasonable possibility of obtaining a judgment of non-infringement in this action because, just like a walkie talkie radio is clearly not a telephone,

significant and obvious differences exist between the operation of VoxerNet's Voxer app and the

asserted claims of the '576 patent.  Most fundamentally, the Voxer app is not a telephone

answering device coupled to a telephone and is incapable of answering incoming telephone calls,

as is required by each of the asserted claims.  (*See* Saunders Decl. ¶ 11, Ex. A, '576 patent, claims

3, 4, 18 and 19 (requiring "automatically answering incoming telephone calls and storing and

retrieving information from the incoming telephone calls with a telephone answering device

having a memory and being coupled to a telephone") (emphasis added); *see also* Saunders Decl. ¶

12, Ex. B, IPVX's Local Patent Rule 3-1 Disclosures, at 2 (identifying claims 3, 4, 18 and 19 as

the "Asserted Claims")).

As explained above, the accused Voxer app is not "connected to a telephone receiving an

incoming call"—while the app can run on some devices that also include telephone circuitry and

functionality, the telephone functionality on such smartphones is not connected to or used by the

Voxer app.  On the contrary, all communications are conducted via asynchronous messages.

Indeed, the telephone capabilities of a smartphone running the Voxer app can be entirely turned

off and the Voxer app will still work.  This becomes even more apparent when running the Voxer

app on devices without telephone capabilities at all, such as on iPad or iPod devices.  The Voxer

software app therefore does not depend on any cellular telephone capabilities of the user's mobile

device.  In addition, all incoming messages in the Voxer app are automatically stored as they are

received—there is no notion of "answering telephone calls."  The recipient merely has the option

of playing back the incoming message as the message is received or playing it later.  In either

case, the message is received and stored the same way.  For similar reasons, the Voxer app does

not receive "first signals specifying each caller of each incoming call" or perform other steps

relating to these "first signals."

VoxerNet's interpretation of the asserted claims as requiring an actual "telephone" and

requiring actual "telephone calls" is consistent with prior constructions of the '576 patent.  The

phrases "automatically answering incoming telephone calls," "telephone answering device," and

"coupled to a telephone" were each construed by the Eastern District of Texas.  *See Klausner*

*Techs., Inc. v. Vonage Holdings Corp.*, No. 2 06-CV-275, 2007 WL 2300789, at *6 (E.D. Tex.

1   Aug. 7, 2007).  In that court's claim construction order, the term "telephone answering device"

2   was construed to mean "an electronic device for answering telephone calls."  *Id.* at *6.  Similarly,

3   the court construed "coupled to a telephone" to mean "connected to a telephone receiving an

4   incoming call."  *Id.*  And the term "automatically answering incoming telephone calls" was not

5   given any special construction as this phrase was found to be "understandable to a juror in the

6   context of the claims at issue."  *Id.* at *5.  The court never suggested at any point in its order that

7   claims with these limitations could be practiced without a telephone or without answering

8   telephone calls.  Thus, while VoxerNet at this time takes no position on the correctness of these

9   constructions, they make clear that an actual telephone and telephone calls are required by the

10  asserted claims.

11       This Court should not credit any argument by IPVX that the preambles of the asserted

12  claims, where the aforementioned claim terms appear, are not limiting.  "If the claim preamble,

13  when read in the context of the entire claim, recites limitations of the claim, or, if the claim

14  preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble

15  should be construed as if in the balance of the claim."  *Pitney Bowes, Inc. v. Hewlett–Packard

16  Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999) (citation omitted).

17       Indeed, when discussing the "claim" in such a circumstance, there is no
18       meaningful distinction to be drawn between the claim preamble and the rest of the
         claim, for only together do they comprise the "claim."  If, however, the body of
19       the claim fully and intrinsically sets forth the complete invention, including all of
         its limitations, and the preamble offers no distinct definition of any of the claimed
20       invention's limitations, but rather merely states, for example, the purpose or
         intended use of the invention, then the preamble is of no significance to claim
21       construction because it cannot be said to constitute or explain a claim limitation.

22  *Id.*  A preamble gives meaning to the claim especially where claim terms in the body of the claim

23  rely upon and derive antecedent basis from it.  *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d

24  1332, 1339 (Fed.Cir.2003) (claim preamble limited the claimed invention where the preamble

25  recited a particular sequence of events that was not defined elsewhere in the claim).

26       Here the nearly identical preambles of claims 3 and 18 (on which claims 4 and 19

27  respectively rely) should be construed along with terms found in the body of these claims as such

28  terms rely upon and derive antecedent basis from the preambles.  In particular, the terms "each

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

caller" and "each incoming call" as seen in claim 3 and 18 would lack antecedent basis unless connected with the phrase "incoming telephone calls" as seen in the preamble.  Indeed, the telephone limitations of the preamble give "life, meaning, and vitality" to each of the terms "caller," "callers," "incoming call," "caller's name," and "first signals," as each would be hopelessly vague unless understood in the context of actual telephone calls.  *See Pitney Bowes*, 182 F.3d at 1305.  The preamble also provides structure and antecedent basis for the claim term "telephone answering device," which is defined there as "having a memory and being coupled to a telephone."  Further, as noted above, the Eastern District of Texas already found the telephone limitations of the preambles to be limiting and noted that the parties to that case "appear[ed] to agree that . . . these terms are limiting and amenable to construction."  *Klausner Techs.*, 2007 WL 2300789, at *2 n.3.

This Court similarly should not credit IPVX's argument that its patent can be broadly construed to read onto any "computer based voice message systems," including those that do not make use of a telephone and do not automatically answer incoming telephone calls.  IPVX usually accompanies this argument with a reference to the prior court's finding that the inventors had not disclaimed "computer based messaging systems" during prosecution of the '576 patent. *See Klausner Techs.*, 2007 WL 2300789, at *5 (finding that the cited "portion of the prosecution history [did not] disclaim computer based voice messaging systems, but rather [was] addressing the examiner's conclusion that certain claims were obvious in light of the referenced prior art").  What IPVX is likely to leave out, however, is that the court went on to hold that the term in question, "automatically answering incoming telephone calls," should be given its plain and ordinary meaning—i.e., that it requires actually answering incoming telephone calls.  *Id.*  Further, as noted above, that same court construed "telephone answering device" as "an electronic device for answering an incoming telephone call" and "coupled to a telephone" as "connected to a telephone receiving an incoming call."  *Id.* at *6.  It certainly did not hold that the '576 patent covers "computer based voice messaging systems" in the absence of any telephone or the answering of any telephone calls, as IPVX will need to argue to prove infringement in this case.

Finally, IPVX's infringement contentions effectively admit that VoxerNet's accused

Voxer product is not literally covered by the asserted claims. In those contentions, IPVX points to no specific features of VoxerNet's product that could meet the telephone limitations and essentially relies only on the doctrine of equivalents. Specifically, IPVX states in its infringement contentions that:

> With respect to *VOXERNET Systems*, to the extent that the *VOXERNET Systems* do not include the claimed "telephone answering device," they include an equivalent to a "telephone answering device" that performs substantially the same function in substantially the same way to obtain substantially the same result.

and that:

> With respect to *VOXERNET Systems*, to the extent that the *VOXERNET Systems* are not "coupled to a telephone" they include a structure equivalent to being "coupled to a telephone" that performs substantially the same function in substantially the same way to obtain substantially the same result.

(Saunders Decl., Ex. B, IPVX's Local Rule 3-1 Disclosures, Appx. A, at 4-5, 23-24.)

IPVX's bare reliance on such boiler plate and conclusory contentions clearly shows that it knows of the flaws in its infringement case. IPVX nevertheless presses on with this lawsuit suit because, as noted above, it apparently has no intention of actually prevailing on the merits.

The Court should not allow IPVX to game the system by continuing with these vexatious litigation tactics without providing VoxerNet some assurance that it will actually be able to recover its fees should it prevail. Accordingly, because VoxerNet has shown that it has a reasonable possibility of obtaining a judgment of non-infringement in this case, IPVX should be required to post an undertaking in the amount of VoxerNet's costs and fees.

### C. VoxerNet Can Expect to Incur at Least $749,000 in Recoverable Costs and Fees

VoxerNet is entitled to its costs and attorney's fees under Rule 11 and the Patent Act because, as explained above, IPVX's infringement action against VoxerNet is vexatious, unjustified and brought in bad faith. *See Gabriel Tech. Corp.*, 2010 WL 3718848, at *14 (requiring bond for defendants' attorneys' fees because "[d]efendants have presented significant, unrebutted evidence that [p]laintiffs' lawsuit is likely unmeritorious, and brought in bad faith").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Indeed, VoxerNet has already incurred significant fees and costs as a result of IPVX's frivolous

2    lawsuit, and can expect to incur significantly more in an effort to establish that its Voxer product

3    did not infringe the '576 patent.

4          The Ninth Circuit has adopted the lodestar method for calculating reasonable recoverable

5    attorneys' fees.  *See, e.g.*, *Jodan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987); *see*

6    *also Recouvreur v. Carreon*,  --- F.Supp.2d.---, 2013 WL 1719199, at *6 (N.D. Cal. Apr. 12,

7    2013).  The lodestar amount is calculated by multiplying the number of hours the prevailing party

8    reasonably expends on this litigation by a reasonable hourly rate.  Although necessarily an

9    estimate in this context, VoxerNet's counsel can expect to spend roughly 1981 hours on the

10   instant litigation, from the time the complaint was filed through the summary judgment stage.

11   (*See* Saunders Decl. ¶ 8.)  Moreover, $337/hour represents an extremely conservative estimate of

12   the reasonable rate to which defense counsel is entitled under the lodestar method.  It is thus

13   possible, if not likely, that the actual amount of recoverable fees and costs in this matter could

14   exceed $749,000, and VoxerNet reserves the right to request additional security, should it prove

15   necessary.

16                          **1.      Reasonable Hourly Rate**

17         The first step in the lodestar inquiry is to establish a reasonable hourly rate for attorney

18   services.  The Laffey Matrix, annexed to this motion as Exhibit I, is frequently used to determine

19   reasonable hourly rates for attorneys of varying levels of experience.  The Northern District of

20   California has previously endorsed the use of the Laffey Matrix in evaluating the reasonableness

21   of attorney fees in this district.  For example, in *HPL Technologies, Inc. Securities Litigation*,

22   Chief Judge Walker described the Laffey Matrix as a "well-established objective source for rates

23   that vary by experience," and used the Laffey rates to establish reasonable attorney fees in this

24   district.  *HPL Technologies, Inc. Securities Litigation*, 366 F.Supp.2d 912, 921 (N.D. Cal. 2005).

25   In so doing, the court recognized that the Laffey rate would tend to undercompensate attorneys in

26   this district, and noted that "adjusting the Laffey matrix figures upward by approximately 9% will

27   yield rates appropriate for the Bay [A]rea."  *Id.*

28         Fenwick's *IPVX v. VoxerNet* litigation team currently consists of four attorneys having 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

years, 11 years, 4 years and 1 year of experience, respectively.  According to the Laffey Matrix, in 2012-2013 attorneys with 11-19 years of experience should be entitled to a rate of $445/hour, attorneys with 4-7 years of experience should be entitled to a rate of $290/hour, and attorneys with 1-3 years of experience should be entitled to a rate of $245/hour.  Fenwick's budgeting department took the rates disclosed above from the Laffey Matrix and blended them based on the expected proportion of hours that would be worked by the attorneys on the team at each experience/billing level.  As a result, the blended rate is heavily skewed toward the billing rates of the more junior attorneys, as past experience and data show they contribute the most billable hours on cases such as this.

According to these calculations the blended rate to be applied in the Lodestar calculation is $310/hr.  Once the 9% upward adjustment for the Bay Area is figured in, the adjustment amount for this district would be $337/hour.  As such, the rate of $337 was chosen for the instant calculations and should be deemed reasonable.

## 2.     Hours Reasonably Expected

At the present time, it is only possible to give a rough estimate of the number of hours that can be expected in the instant litigation, but counsel has attempted to produce such an estimate.  In so doing, a model was prepared to estimate the number of hours Fenwick could reasonably be expected to bill in the instant litigation through the claim construction and summary judgment hearing, which the Court has scheduled for July 2, 2014.  (*See* Saunders Decl. ¶¶ 5-7.)  To create this model, Fenwick's budgeting department incorporated the hours already billed in this matter and then used estimates to project the hours that will be worked between now and the July 2 hearing.  (*Id.*)  These forward-looking projections are based on similar recently-litigated PAE patent cases, including one from the Northern District of California in which Fenwick defended its client against infringement allegations brought by another PAE for infringement of one patent.  (*Id.* at 5.)

Based on such estimates, counsel has determined that it can expect to expend approximately 1981 hours on the instant litigation, through the July 2, 2014 claim construction and summary judgment hearing.  This estimate is broken down in detail in the Saunders

Fenwick & West LLP
Attorneys at Law
San Francisco

1   Declaration and Exhibit J.  (*See* Saunders Decl. ¶ 8 and Ex. J.)  VoxerNet would note that this

2   estimate is significantly low for several reasons.  First, it does not account for any time worked by

3   Fenwick's paralegals and document review staff attorneys, which fees VoxerNet is also

4   responsible for.  Second, it assumes that VoxerNet will only take one deposition and defend one

5   deposition before July 2, while VoxerNet may end up taking and defending as many as six

6   depositions.  (*See* Saunders Decl. ¶ 7.)  Nevertheless, using the blended average hourly rate of

7   $337 and estimating the "hours expected" at 1981, Fenwick's estimated attorneys' fees are

8   $667,000.

9       In addition, as noted in the Saunders Declaration and Exhibit K, counsel has estimated

10  that defendant has incurred and is expected to incur roughly $82,000 in costs from the time the

11  complaint was filed in this action until the July 2, 2014 hearing.  (*See* Saunders Decl. ¶ 10 and

12  Ex. K.)  When added to the numbers above, this creates a combined amount of $749,000.  Based

13  on information collected by the American Intellectual Property Law Association, the median

14  estimated total cost of defending against patent infringement claims brought by a non-practicing

15  entity through the end of discovery and where $1-10 million is at stake, is $1,125,000 in San

16  Francisco. (Saunders Decl., Ex. M, excerpts from AIPLA, Report of the Economic Survey

17  (2013), at 38, I–145.)  Accordingly, the Court should deem the amount VoxerNet seeks to be

18  reasonable.

19  **V.    CONCLUSION**

20      Cal. Code Civ. Proc. § 1030 provides that a plaintiff shall be required to post an

21  undertaking to secure expected costs and fees if the plaintiff is an out-of-state corporation and

22  there is a reasonable possibility that defendant will obtain favorable judgment.  Each criteria is

23  satisfied in the instant matter.  IPVX is undeniably an out-of-state corporation, organized under

24  the laws of Delaware and having no connection with the state of California beyond litigating its

25  '576 patent there.

26      In addition, there is a reasonable possibility (if not more) that VoxerNet will obtain

27  judgment in the instant matter.  IPVX has failed to show any way that VoxerNet's accused Voxer

28  app and service can possibly infringe claims requiring it to "automatically answer[ ] incoming

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

telephone calls" and to "stor[e] and retriev[e] information from the incoming telephone calls with a telephone answering device having a memory and being coupled to a telephone."

Based on the foregoing, it is clear that there is at least a "reasonable possibility" that VoxerNet will obtain judgment of non-infringement in this matter.  As such, IPVX should be required to post an undertaking sufficient to secure an eventual award of costs and fees. VoxerNet has estimated that the total costs and fees in this matter could easily approach or exceed $749,000 and requests an undertaking in that amount.


Dated:     November 22, 2013                        Respectfully Submitted,

                                                    /s/ Hector J. Ribera
                                                    Hector J. Ribera
                                                    Fenwick & West, LLP

                                                    Attorneys for Defendant
                                                    VOXERNET, LLC

1

## <u>CERTIFICATE OF SERVICE</u>

2

3     The undersigned hereby certifies that on this 22nd day of November, 2013, a true and

4     correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system and

5     served on all of those parties receiving notification through the CM/ECF system.

6

7                                    *s/ Michael C. Saunders*
                                     Michael C. Saunders

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO